ANDREW M. ZACKS (SBN 147794)
SARAH M. K. HOFFMAN (SBN 308568)
ZACKS, FREEDMAN & PATTERSON, PC
235 Montgomery Street, Suite 400
San Francisco, CA 94104
Tel: (415) 956-8100
Fax: (415) 288-9755
az@zfplaw.com
sarah@zfplaw.com

Attorneys for Plaintiffs:
Erin Leigh Maher, Jason Reindorp, Nick Medina, Monica Calmet, South Of Market Business Association, 570 Jessie LLC, Sierrec LLC dba Montesacro Pinseria Romana, Megali Souvla Inc. dba Souvla, Design Like Whoa, LLC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIN LEIGH MAHER, JASON REINDORP, NICK MEDINA, MONICA CALMET, SOUTH OF MARKET BUSINESS ASSOCIATION, 570 JESSIE LLC, SIERREC LLC dba MONTESACRO PINSERIA ROMANA, MEGALI SOUVLA INC. dba SOUVLA, DESIGN LIKE WHOA, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, a municipal entity,<br><br>Defendant. | Case Number:<br><br>**COMPLAINT FOR:**<br><br>1. **Public Nuisance (Civil Code § 3479)**<br>2. **Private Nuisance (Civil Code § 3501)**<br>3. **Negligence**<br>4. **Violation of Due Process / Takings (42 U.S.C. § 1983; U.S. Const. Amend. V/XIV)**<br>5. **Inverse Condemnation (Cal. Const. art. I § 19)**<br>6. **Violation of Equal Protection (42 U.S.C. § 1983; U.S. Const. Amend. V/XIV)**<br>7. **Violation of Title II of the Americans with Disabilities Act (42 U.S.C. §§ 12131 *et seq.*)**<br>8. **Violation of Section 504 of the Rehabilitation Act (29 U.S.C. §§ 794 *et seq.*)**<br>9. **Violation of California Disabled Persons Act (Civil Code § 54 *et seq.*)**<br>10. **Municipal Liability for Unconstitutional Custom or Policy (42 U.S.C. § 1983)**<br><br>**DEMAND FOR JURY TRIAL** |

## I.  INTRODUCTION

1. San Francisco's mid-Market neighborhood is in a state of crisis, precipitated by the City's pattern and practice of willful neglect.

2. The mid-Market neighborhood is a culturally vibrant community, home to a diverse population, including immigrants, senior citizens, people with disabilities, and SRO residents. It is also a hub for technology and the arts, with a number of tech companies, theaters, and cultural resources located in mid-Market.

3. However, mid-Market has also become home to tent encampments, rampant criminal activity, and antisocial behavior that should not be tolerated in any civilized society. Trash, drug paraphernalia, and human waste has been allowed to accumulate on the streets and sidewalks and left to fester.

4. The City has created and perpetuated these conditions through its pattern and practice of tacitly treating mid-Market as a "containment zone" that bears the brunt of San Francisco's homelessness issues, and its failure to take action to address these issues.

5. The City has displayed a consistent attitude of apathy and inaction in this neighborhood for decades. However, the situation has been exacerbated by the COVID-19 crisis. Permanent tent encampments have proliferated throughout mid-Market and the City has refused to take action to ensure the safety of the homeless population and residents of this neighborhood. Residents are unable to leave their homes without being threatened and put in danger of serious bodily harm. Small businesses that have operated in the mid-Market neighborhood for many years are facing a steep decline in customers and revenue due to the conditions in this area.

6. Plaintiffs make the factual allegations and assert the legal claims herein in an effort to compel the City and County of San Francisco (the "City") to comply with its legal duties.

## II.  JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. §§ 12131 et seq. (the "ADA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 et seq. ("Section 504"); and the Fifth and

Fourteenth Amendments of the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201 & 2202.

8. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same case or controversy as Plaintiffs' federal claims.

9. Plaintiffs seek only equitable and injunctive relief for their state law claims. Accordingly, Plaintiffs need not submit a compensation claim with any local public entity pursuant to the California Tort Claims Act, Cal. Gov't Code §§ 810 *et seq*.

10. Venue is proper pursuant to 28 U.S.C. § 1391(a) in that all defendants reside in this judicial district and the events giving rise to the claims occurred in the Northern District of California.

### III.  INTRADISTRICT ASSIGNMENT

11. A substantial part of the events or omissions which give rise to the claims asserted in this Complaint occurred in the City and County of San Francisco, and a substantial part of the property that is the subject of the action is located in the City and County of San Francisco. (Civil L.R. 3-2(c).)

### IV.  PARTIES

12. Plaintiff ERIN LEIGH MAHER ("Maher") is an individual and a resident at the apartment building located at 570 Jessie Street. Maher uses a mobility scooter and is a protected individual under both the Americans with Disabilities Act and the California Disabled Persons Act.

13. Plaintiff JASON REINDORP ("Reindorp") is an individual and a resident at the apartment building located at 570 Jessie Street.

14. Plaintiff NICK MEDINA ("Medina") is an individual and a resident at the apartment building located at 570 Jessie Street.

15. Plaintiff MONICA CALMET ("Calmet") is an individual and a resident at the apartment building located at 570 Jessie Street.

16. Plaintiff SOUTH OF MARKET BUSINESS ASSOCIATION ("SomBa") is

nonprofit organization working to promote South of Market as a vital place to live, work, visit and do business. SomBa is located at 615 Seventh Street and mobilizes businesses, residents, community groups and government representatives to identify priorities, challenges and solutions to maintain a strong and vibrant community.

17. Plaintiff 570 JESSIE LLC ("570 Jessie") is a California limited liability company doing business in San Francisco and the owner of the 47-unit apartment building located at 570 Jessie Street, San Francisco. 570 Jessie developed the building in 2017

18. Plaintiff SIERREC LLC dba MONTESACRO PINSERIA ROMANA ("Montesacro") owns and operates Montesacro Pinseria Romana, a beloved locally-owned neighborhood restaurant that has been in operation since 2015 at 510 Stevenson St, San Francisco.

19. Plaintiff MEGALI SOUVLA INC., dba Souvla ("Souvla") is a California S-Corporation doing business in San Francisco. Souvla owns and operates multiple locations of its modern Greek restaurant concept in neighborhoods throughout the city. Souvla has been in operation since 2014, and in addition to its restaurants, owns and operates Odos Souvla LLC (dba Souvla), its combination commissary/catering kitchen and delivery-only restaurant located at 532 Jessie Street. This specific location has been in operation since the start of 2016.

20. Plaintiff DESIGN LIKE WHOA, LLC ("DLW") is a California limited liability company doing business in San Francisco. DLW is a women-led local business that sells customized apparel and accessories from its storefront at 531 Jessie Street.

21. Defendant CITY AND COUNTY OF SAN FRANCISCO ("Defendant" or "City") is an incorporated municipality of the State of California.

V.    **STATEMENT OF FACTS**

A. **The Mid-Market Neighborhood**

22. The mid-Market neighborhood of San Francisco ("mid-Market") is an area bordered by Market Street, Fifth Street, Mission Street, and Van Ness Avenue, adjacent to the San Francisco Civic Center. This is an economically and culturally diverse neighborhood, home to both SRO hotels and new apartment buildings, to both large tech companies and small

ZACKS, FREEDMAN & PATTERSON, PC
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

neighborhood businesses. The mid-Market neighborhood is also the heart of San Francisco's arts scene, home to a number of theaters.

23. Following the 1906 earthquake, mid-Market developed as a vibrant retail and theater hub, lit up with neon signs and bustling with activity.

24. However, from the 1960s, the conditions and quality of life at mid-Market experienced a steep decline. The 1967 Market Street Beautification Act required the marquees and neon signs to be removed, and BART construction drove traffic and patronage away from mid-Market. Struggling stores and theaters closed down and were replaced with liquor stores, check-cashing companies, and fast food outlets. The proliferation of boarded-up storefronts and disused buildings blighted mid-Market and attracted transients and criminal activity. By 1985, local journalist Herb Caen dubbed mid-Market "le grande pissoir" due to its filthy sidewalks and "miserable streets."

25. The decline of mid-Market has continued to the present day. In 2011 the City offered a tax break to incentives businesses to move to the area and boost its economic development. The City has also encouraged the development of apartment buildings in the area. However, the City's promotion of new development in mid-Market has not been matched with resources to promote safe and sanitary conditions in this neighborhood. Crime, refuse, and other undesirable conditions persist in mid-Market:



26. The city has abdicated its responsibility to provide housing, sanitation services, and healthcare for its most vulnerable residents.

**B. The Current Crisis**

27. While homelessness and crime have always been issues in mid-Market, by early 2020 these problems reached crisis levels. The situation in mid-Market has become exponentially worse and is causing serious harm to the health and welfare of all concerned.

28. Tent encampments, bicycle chop-shops, drug dealers, and illegal street vendors have proliferated on the sidewalks throughout mid-Market. For example, the City has allowed the 500 block of Jessie Street (at Sixth Street), to become a permanent encampment, with 12-16 tents completely blocking both sides of the sidewalk at all times. The occupants of the tents openly inject drugs, leave drug paraphernalia and litter strewn over the sidewalk, and defecate in public:





COMPLAINT
-6-

29. Similarly, the City has allowed a permanent encampment of more than 30 tents on the 400 block of Stevenson Street, creating similar trash, drug, and sanitation problems:



30. The behavior in this area is not limited to "quality of life" crimes; violence routinely breaks out, both among the campers and against local residents and workers, and bicycle chop shops are being openly operated. A resident of Jessie Street was bitten by a roving dog owned by one of the campers. On another occasion, several residents were threatened by a mentally unstable man wielding a hammer.

31. Of equal concern, the tents and other personal effects have completely blocked access to public sidewalks so that pedestrians are forced to walk on the road. This presents a particular burden for citizens with disabilities, who cannot easily move out of the way of traffic:



32. The squalid conditions in the mid-Market area are dangerous and completely unacceptable. Residents are afraid to leave their homes and employees do not feel safe coming to work. Small businesses that are already struggling due to COVID-19 are facing a precipitous drop in customers due to the homeless encampments on their doorstep.

33. The City has allowed these conditions to persist with impunity. Residents' and business owners' complaints to the City have been met with canned email responses or simply ignored. Although the City has erected a "24/7 Pit Stop" (public toilet and needle disposal facility) on Jessie and Sixth Street, this has only made matters worse, by attracting more tent occupants and, on at least one occasion, leaking toxic liquid onto the street, where people are currently forced to walk due to the sidewalk obstructions.

34. The City has in effect used mid-Market as a "containment zone" for homeless residents. While emergency calls and 311 complaints are responded to in wealthier, more rarified neighborhoods, the City's approach to the same conduct in mid-Market displays a pattern of apathy and neglect. 311 requests are routinely closed out despite nothing being done to address the complaint, and beat cops ignore criminal activity occurring right in front of them. Street and sidewalk cleaning occur infrequently, so that refuse and human bodily fluids are allowed to accumulate and fester on the public right-of-way, attracting rodents and other pests:



35. With the recent COVID-19 pandemic, mid-Market is experiencing an immediate and dire public health crisis. The homeless population of mid-Market is unable to "shelter-in-

place" or practice social distancing, and is exempt from the shelter-in-place order. They do not have access to sanitation services and do not wear face coverings. However, the City has not found shelter for the homeless population or conducted wide-spread COVID-19 testing among this vulnerable group. The City's policy of neglect has put the homeless population and the residents and workers of mid-Market at greater risk of contracting COVID-19.

36.     On June 26, 2020, counsel for the Plaintiffs wrote to the City, informing it of these issues and demanding that the City take prompt remedial action. No appreciable changes occurred, and the conditions at mid-Market have, if anything, deteriorated further.

### C. Impact on Plaintiffs

37.     The Plaintiffs, as residents and business owners in mid-Market, are acutely impacted by the current conditions.

38.     Plaintiff Maher has lived at 570 Jessie Street since early 2018. Maher has a disability and uses a mobility scooter to get around. She currently cannot use the sidewalk to get to her home due to the tents that permanently block the sidewalk. Instead, she must drive her mobility scooter on the road in order to leave or enter her place of residence. As a single woman with a disability, Maher has concerns for her safety whenever she leaves her home, due to the conditions in mid-Market. Maher has been verbally abused by the occupants of the tent encampment and loiterers on Jessie Street, and has witnessed drug use, fights, and robberies occurring in broad daylight. On one occasion, a truck servicing the Pit Stop on Sixth and Jessie Street blocked the intersection, so that Maher was trapped on Jessie Street (which is not a through road), because both the road and sidewalks were obstructed.

39.     Reindorp has lived at 570 Jessie Street since January 2018. Reindorp has observed a drastic deterioration of the conditions in front of 570 Jessie Street over the past few months, with the number of tents and homeless occupants increasing dramatically. Reindorp has witnessed people injecting drugs in plain sight and fighting on the sidewalk. The tent occupants play loud music and have verbal altercations at all hours. Reindorp has been verbally abused and called a "faggot" while walking to his apartment. On one occasion he was advised by a Pit Stop attendant to avoid the "toxic" liquid leaking onto the street from the Pit Stop.

ZACKS, FREEDMAN & PATTERSON, PC
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

Reindorp has filed multiple 311 complaints and written to City agencies regarding the conditions at mid-Market. These complaints have been routinely ignored and summarily closed. Reindorp has observed a further deterioration of the conditions at Jessie Street since June 2020.

40. Medina has lived at 570 Jessie Street since 2019. His quality of life has been negatively impacted by the conditions at mid-Market. Medina has observed a significant reduction of the municipal services provided to this area, including but not limited to the cessation of regular street-cleaning. Medina has also filed multiple 311 complaints and has been similarly ignored by City agencies.

41. Calmet has lived at 570 Jessie Street since 2017 and has also witnessed a drastic deterioration of the conditions at mid-Market. As a woman living alone, she is concerned about her safety when she leaves her apartment or walks her dog in the area due to the threat of violence or bodily injury and the verbal harassment she faces. Indeed, one of her neighbors at 570 Jessie Street moved out because he was bitten by a roving dog owned by one of the tent occupants. On one occasion when walking her dog - on the road due to the sidewalk being blocked - Calmet was warned by a Pit Stop attendant to be careful of the liquid leaking from the Pit Stop because it was toxic. Calmet has made multiple complaints to City agencies and has also been ignored.

42. SomBa and its members have been significantly impacted by the conditions at mid-Market. Like many small businesses in San Francisco, SomBa's members have experienced a dramatic drop in customers and revenue due to the COVID-19 crisis. This has been exacerbated by the crime and other antisocial behavior on their doorsteps. The tent encampments and chop shops block physical access to local businesses, and the antisocial activity in this area discourages customers and employees from visiting them.

43. 570 Jessie developed the 47-unit apartment building at 570 Jessie Street in 2017. The City supported this project, and 570 Jessie reasonably relied on the City to provide safe and sanitary conditions in its vicinity and fulfill its municipal functions, including by undertaking regular street cleaning and keeping the sidewalk clear. As a result of the City's

failure to do so, residents have moved out of 570 Jessie Street and have specifically cited the homelessness and crime in the area as their reason for doing so.

44. Montesacro is a beloved neighborhood restaurant in mid-Market. After being forced to close due to the COVID-19 crisis, Montesacro recently reopened for pick-up orders and outdoor dining. Although Montesacro had a promising reopening thanks to its loyal customer base, the flow of customers precipitously dropped off due to the conditions on Montesacro's doorstep. Gianluca Legrottaglie, the proprietor of Montesacro, has witnessed a dramatic change in the conditions near Montesacro over the recent months. Tents block access to the restaurant, drugs are openly dealt and consumed outside its door, and parked vehicles are regularly broken into. On a number of occasions, Montesacro's garbage bins have been stolen and emptied onto the street. Both 911 calls and 311 requests are routinely ignored. If the conditions at mid-Market persist, Montesacro may be forced to close or relocate.

45. Souvla operates its combination commissary/catering kitchen and delivery-only restaurant located at 532 Jessie Street. This location has been in operation since the start of 2016. All of Souvla's locations were closed for the first 115 days of Shelter-In-Place due to COVID-19 and its various safety concerns. In Souvla's phased re-opening process, the commissary kitchen has become more essential than ever so that the company can centralize its operations and limit the amount of staff in their restaurants for safety and social distancing purposes. This kitchen is now the hub of the operation and an essential source of revenue for Souvla. However, the homeless encampments that line Jessie Street obstruct employees and delivery drivers and vehicles from accessing the premises. Souvla's employees, many of whom are women, are reluctant to return to work, specifically saying that they are scared to come to and/or leave work due to the dangerous conditions on its doorstep. The founder and CEO of Souvla has written to the Mayor's Office, the Director of Public Works, the District Supervisor and the local Police Captain outlining the street conditions and their impact on re-opening his restaurants. He was met with generic responses and excuses. If the street conditions on Jessie Street and in mid-Market persist, Souvla may be forced to close or relocate this kitchen after investing over $500,000 in improvements, and exit its lease of the premises.

46. DLW is a female-led local business that sells customized apparel and accessories from 531 Jessie Street. DLW employees and customers are fearful for their safety and health due to the unsanitary, intimidating, and illegal behaviors of the occupants of the tent encampments. Furthermore, DLW has been unable to fully reopen due to these conditions. If the conditions at mid-Market persist, DLW may be forced to close or relocate.

## VI.   CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF

**Public Nuisance**
**Civil Code § 3479**
**(All Plaintiffs against Defendant)**

47. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 46 of this Complaint.

48. Civil Code § 3479 defines a "nuisance" as:

> [a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway. . . .

49. Physical interference with the enjoyment of land is a nuisance, as is a condition which is a danger to the neighborhood. (*Buchanan v. Los Angeles County Flood Control Dist.* (1976) 56 Cal.App.3d 757, 768.) A public nuisance is the substantial and unreasonable interference with a public right. (*San Diego Gas & Elec. Co. v. Superior Court* (1996) 13 Cal. 4th 893, 938 .) A public entity is not immune from liability for nuisance. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 936-937.

50. In failing to maintain the public property under its control or to enforce local and state laws prohibiting nuisance activity, the City has permitted and facilitated a public nuisance. The conditions at mid-Market include the open and unregulated "illegal sale of controlled substances," are "indecent or offensive to the senses," and obstruct "the free use of property, so as to interfere with the comfortable enjoyment of life or property." Moreover, the City has

1  allowed and perpetuated the unlawful obstruction of the "free passage or use" of public
2  sidewalks.

3      51.    All Plaintiffs have had their enjoyment of their life and property substantially and
4  unreasonably interfered with, and had their free passage of public sidewalks obstructed. Each
5  Plaintiff has suffered and continues to be threatened with respect to his, her, or its health and
6  welfare, due to the persistent threat of disease and exposure to waste, trash, human bodily
7  fluids, and criminal behavior.

8      52.    Each Plaintiff has suffered specific injury in his, her, or its own right, and has not
9  consented to the City's conduct. The damage suffered by each Plaintiff is different in kind and
10 not merely in degree from that suffered by other members of the public. (*Koll-Irvine Center
11 Property Owners Assn. v. County of Orange* (1994) 24 Cal.App.4th 1036, 1040.)

**SECOND CLAIM FOR RELIEF**
**Private Nuisance**
**Civil Code §§ 3501 *et seq.***
**(All Plaintiffs against Defendant)**

15     53.    Plaintiffs incorporate herein by reference the allegations contained in Paragraphs
16 1 through 52 of this Complaint.

17     54.    Private nuisance is a civil wrong based on disturbance of rights in land. (*Venuto
18 v. Owens–Corning Fiberglas Corp.,* (1971) 22 Cal.App.3d 116, 124.)

19     55.    Each Plaintiff owns, leases, occupies, or otherwise controls all or a portion of the
20 home or business identified.  As outlined above, the City's actions and inactions have created
21 conditions and permitted conditions to exist that are harmful to the health, indecent and offensive
22 to the senses, obstruct the free passage of public sidewalks, and permits the open and illegal sale
23 of controlled substances.

24     56.    The City's conduct has been and is intentional and unreasonable, or unintentional
25 but negligent or reckless.  Alternatively, the condition permitted to exist was the result of
26 abnormally dangerous activity that substantially interfered with each Plaintiff's use or enjoyment
27 of his, her, or its land that would reasonably annoy or disturb an ordinary person.

28     57.    No Plaintiff consented to the City's conduct; each was harmed; the City's conduct

ZACKS, FREEDMAN & PATTERSON, PC
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

was a substantial factor in causing the harm; and the seriousness of the harm outweighs any public benefit of such conduct (which is none).

### THIRD CLAIM FOR RELIEF
**Negligence**
**(All Plaintiffs against Defendant)**

58. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 57 of this Complaint.

59. The City, through its agents and employees, has the sole right and responsibility to control, maintain, and keep the public right of way safe and sanitary, including sidewalks, roads, and public buildings, and to enact and enforce laws to preserve public health and safety. The City has a duty to maintain public areas in a manner that does not unreasonably interfere with the free passage or use by Plaintiffs and that addresses and alleviates conditions that are harmful to health or indecent or offensive to the senses, that create a fire hazard, or that permit crime to occur unabated including the illegal sale of controlled substances.

60. In particular, the public is entitled to the free and unobstructed use of the entire streets and sidewalks. . . ." (*Vanderhurst v. Tholcke*, 113 Cal. 147, 152 (1896).) The City has a legal duty to keep its "communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated." (*Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 160 (1939).)

61. The City, and its agents and employees, has breached its duty to all San Francisco residents, including and specifically to the Plaintiffs. The City's breach of its duties has caused each Plaintiff to suffer injury.

### FOURTH CLAIM FOR RELIEF
**Violation of Due Process / Takings**
**42 U.S.C. § 1983; U.S. Const. Amend. V/XIV**
**(All Plaintiffs against Defendant)**

62. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 61 of this Complaint.

63. The City has derogated from its legal duties to provide municipal services, safe and secure living conditions, and unimpeded access to public sidewalks in mid-Market. The City

has adopted a policy and practice of using the mid-Market area as a containment zone, allowing homeless residents and encampments to become concentrated in this neighborhood, while clearing such activity from more affluent neighborhoods. This practice and policy does not substantially advance a legitimate government interest.

64. The City has denied its residents the due process of law and effected an uncompensated taking of property interests, in violation of the Fifth and Fourteenth Amendments of the United States Constitution. The wretched conditions in mid-Market and immediate threat of COVID-19 infection endanger the health and lives of its residents and has deprived property owners and occupants of their liberty and use of their property, including the economically viable use of their properties.

65. Moreover, by the acts and omissions described above, the City has affirmatively created or increased the risk that Plaintiffs would be exposed to dangerous conditions, which placed Plaintiffs specifically at risk, and Plaintiffs were harmed as a result. The City knew or should have known that its acts or omissions endangered Plaintiffs.

66. Upon information and belief, this was done with deliberate intent and/or reckless disregard of Plaintiffs' rights. Plaintiffs seek injunctive relief and the cost of attorneys' fees in bringing this action.

**FIFTH CLAIM FOR RELIEF**
**Inverse Condemnation**
**Cal. Const. art. I § 19**
**(All Plaintiffs against Defendant)**

67. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 66 of this Complaint.

68. California Constitution, article I § 19(a) provides that "private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

69. That is, the California Constitution forbids state actors from *damaging* a property interest. By effectively designating and using mid-Market as a containment zone for homeless residents, the City has substantially burdened, limited, and/or damaged the Plaintiffs' property and business so as to constitute a regulatory taking, without providing compensation.

### SIXTH CLAIM FOR RELIEF
**Violation of Equal Protection**
**42 U.S.C. § 1983; U.S. Const. Amend. V/XIV**
**(All Plaintiffs against Defendant)**

70. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 69 of this Complaint.

71. By enforcing the law in some areas of San Francisco and declining to enforce the law in the mid-Market neighborhood, the City has arbitrarily and irrationally determined which neighborhoods must accept encampments on their doorsteps and bear the burden of homelessness and crime in San Francisco. The City has permitted such activity to be concentrated in ethnically diverse and less wealthy neighborhoods such as mid-Market, rather than in more affluent areas of the City. This violates the City's own procedures and both state and federal law, imposing a disproportionate burden on the mid-Market community, including Plaintiffs.

72. Upon information and belief, the City acted with deliberate intent and/or reckless disregard of Plaintiffs' rights. Plaintiffs seek injunctive relief and the cost of attorneys' fees in bringing this action.

### SEVENTH CLAIM FOR RELIEF
**Violation of Title II of the Americans with Disabilities Act**
**42 U.S.C. §§ 12131 *et seq.***
**(Plaintiff MAHER against Defendant)**

73. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 72 of this Complaint.

74. The ADA compels public agencies such as the City to afford people with disabilities "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." (42 U.S.C. § 12182(a).)

75. Specifically, the ADA requires that "[a] public entity . . . maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part."

76. A sidewalk is a facility that is subject to the access requirements of the ADA. The City must maintain public sidewalks so that people with mobility issues, including

wheelchair and mobility scooter users, can access the sidewalk. The Ninth Circuit has held that "maintaining public sidewalks is a normal function of a city" and therefore "maintaining their accessibility for individuals with disabilities therefore falls within the scope of Title II." (*Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002).)

77. In order to comply with the ADA, a sidewalk must be at least 36 inches in width. (36 C.F.R. § 1191, app. D, § 403.5.1 ("the clear width of walking surfaces shall be 36 inches (915 mm) minimum.")

78. It is not sufficient for the City to simply provide "accessible routes" if they are not maintained in a manner that enables individuals with disabilities to use them. If the sidewalk is obstructed so that it is neither "accessible to" nor "usable by" individuals with disabilities, it is non-compliant.

79. Throughout the mid-Market neighborhood, the City has failed to maintain sidewalks so that they are readily accessible to and usable by persons with disabilities.

80. This denial of access and discrimination is a direct result of the City's policy and practice of permitting encampments and tents to be established on public sidewalks in this area, and failing to adopt or implement procedures for clearing obstructions from the public right-of-way.

81. Plaintiff Maher has been directly and proximately impacted by the aforementioned acts, including the City's deliberate disregard for Maher's federally-guaranteed rights under the ADA. Maher *cannot access her home via the sidewalk*. Instead, she is forced to navigate her mobility scooter on the road, putting her at risk of bodily injury or death every time she leaves her home. Maher has been subjected to indignity and emotional distress and has been deprived of her independence and access to public establishments.

82. Maher is entitled to recover attorneys' fees and costs incurred in connection with this action pursuant to 42 U.S.C. § 12133 and 29 U.S.C. § 794a(b).

**EIGHTH CLAIM FOR RELIEF**
**Violation of Section 504 of the Rehabilitation Act**
**29 U.S.C. §§ 794 *et seq.***
**(Plaintiff MAHER against Defendant)**

83. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 82 of this Complaint.

84. Section 504 of the Rehabilitation Act of 1973 provides:
> [N]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

85. Plaintiff Maher is qualified to participate in the services, programs, or activities that are provided to individuals in the City. The City receives federal financial assistance and is thus subject to Section 504.

86. Upon information and belief, the City and its agents and employees have violated and continue to violate Section 504 of the Rehabilitation Act by excluding Maher from participation in, denying her the benefits of, and subjecting her to discrimination regarding the benefits and services involved in utilizing public sidewalks based solely on her disability.

87. Upon information and belief, said discrimination occurred with deliberate intent and/or reckless disregard of Maher's rights.

88. Maher seeks injunctive relief and the cost of attorneys' fees in bringing this action.

### NINTH CLAIM FOR RELIEF
**Violation of California Disabled Persons Act**
**Civil Code § 54 *et seq.***
**(All Plaintiffs against Defendant)**

89. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 88 of this Complaint.

90. California's Disabled Persons Act mirrors the ADA and requires that equal and full access to sidewalks be provided to individuals with disabilities. Specifically, the Act provides that:
> Individuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, . . . , public facilities, and other public places.

91. As outlined above, Plaintiff Maher is an individual with disabilities as defined by the Disabled Persons Act, who is being denied full and free use of public sidewalks, by the

policies and practices of the City, including its failure regularly to maintain its sidewalks in a manner that permits mobility scooter users "full and free use" thereof.

### TENTH CLAIM FOR RELIEF
**Municipal Liability for Unconstitutional Custom or Policy**
**42 U.S.C. § 1983**
**(All Plaintiffs against Defendant)**

92. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 91 of this Complaint.

93. On information and belief, the City and its agents and employees, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiffs, engaged in the unconstitutional acts and omissions set forth above, all pursuant to policy, procedure, or customs held by the City.

94. The acts and omissions of the City were known or should have been known to the policy makers responsible for that agency and occurred with deliberate indifference to the constitutional violations set forth above, and/or to the strong likelihood that constitutional rights would be violated as a result of its customs and/or policies.

95. Plaintiffs seek injunctive relief, and the cost of attorneys' fees in bringing this action.

WHEREFORE, Plaintiff demands judgment against the City for the following:

**For All Claims:**

1. Injunctive/equitable relief in a manner to be determined by law;
2. For an award of attorneys' fees and costs as allowed by law; and
3. For any other relief that the Court deems just and proper.

Dated: July 16, 2020

ZACKS, FREEDMAN & PATTERSON, PC

By: Andrew M. Zacks
Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury for all claims as stated herein.

Dated: July 16, 2020

ZACKS, FREEDMAN & PATTERSON, PC

By: _____
Andrew M. Zacks
Attorneys for Plaintiffs